Filed 10/23/14  p. V. Langarica CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(San Joaquin)

----

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>GABRIEL ARMANDO LANGARICA et al.,<br><br>    Defendants and Appellants. | C069062<br><br>(Super. Ct. Nos. SF110015B & SF110015A)<br><br>ORDER MODIFYING OPINION; NO CHANGE IN JUDGMENT |

THE COURT:

It is ordered that the opinion filed in this case on September 24, 2014, be modified as follows:

Page 1, first sentence, delete the words "during the commission of a burglary" so that the sentence now reads:

1

A jury convicted codefendants and brothers Gabriel Langarica and Phillip Corral of kidnapping for ransom or extortion, rape by force or fear, forcible oral copulation, assault with intent to commit sex crimes, robbery, burglary, and criminal threats.

Page 2, first full paragraph, contention (6), delete the word "abstract" and replace it with "abstracts" and delete the word "does" and replace it with "do" so contention (6) now reads:

and (6) the abstracts of judgment do not reflect the trial court's oral pronouncement of judgment.

Page 2, second full paragraph, delete the last two sentences and replace them with the following:

However, we will modify the judgment to stay a one-year enhancement of Corral's sentence based on a prior prison term, and we will affirm the judgment as modified. We will also direct the trial court to correct clerical errors in the abstracts of judgment.

Page 6, second line, delete the words "during the commission of a burglary" and replace "(b)" with "(a)" so that the last sentence on page 5 and continuing at the top of page 6 now reads:

The jury convicted Langarica and Corral of kidnapping for ransom or extortion (Pen. Code, § 209, subd. (a) -- count 1);[2] rape by force or fear (§ 261, subd. (a)(2) -- counts 2 and 3); forcible oral copulation (§ 288a, subd. (c)(2) -- count 4); assault with intent to commit a sex crime (§ 220, subd. (a) -- count 5); first degree residential robbery (§ 211 -- count 6); first degree residential burglary (§ 459 -- count 7); and criminal threats (§ 422 -- count 8).

---

[2] Undesignated statutory references are to the Penal Code.

Page 10, first full sentence, delete the words "during the commission of a burglary" so that the sentence now reads:

Langarica asserts there was insufficient evidence to support his convictions for rape, oral copulation and assault with intent to commit sex crimes.

Page 21, first sentence in part VI, delete the word "abstract" and replace it with "abstracts" and delete the word "does" and replace it with "do" so the sentence now reads:

Defendants contend the abstracts of judgment do not track the trial court's oral pronouncement of sentence.

Page 22, second full sentence, delete "abstract" and replace it with "abstracts" so the sentence now reads:

The abstracts of judgment, however, erroneously directed the restitution to be paid directly to the victims and did not mention the joint and several nature of the obligation.

Page 22, fourth full sentence, delete "abstract" and replace it with "abstracts" so the sentence now reads:

We agree that the abstracts must be corrected in this regard.

Page 22, first full paragraph, first sentence, delete "abstract" and replace it with "abstracts" so the sentence now reads:

Defendants further contend an order for a $1,000 mandatory fee to San Joaquin County must be stricken from the abstracts because it was not included in the oral pronouncement of sentence.

Page 22, last paragraph, first sentence, delete "abstract" and replace it with "abstracts" so the sentence now reads:

The trial court apparently realized its error in omitting the mandatory fee and corrected it in the abstracts of judgment.

Page 23, first full paragraph, first sentence, delete "abstract" and replace it with "abstracts" so the sentence now reads:

3

Defendants contend for the first time in Corral's reply brief that although the fee is mandatory, it will be levied by the Department of Corrections and Rehabilitation without reference to the abstracts of judgment, so there is a risk of a surcharge on the surcharge.

Page 23, after the first full paragraph, before part VII, insert a new paragraph reading as follows:

We identified an additional clerical error in both abstracts of judgment. The abstracts indicate that defendants were convicted on count 5 of violating Penal Code section 220, subdivision (b). But they were actually convicted of violating Penal Code section 220, subdivision (a). We will direct the trial court to correct those clerical errors in the abstracts of judgment.

Pages 23-24, delete the disposition and replace it with the following:

DISPOSITION

The judgment is modified to stay the one-year robbery-related prison term enhancement pursuant to section 667.5, subdivision (b). The judgment is affirmed as modified. The trial court is directed to amend the abstracts of judgment to reflect the judgment as modified, and to correct the abstracts of judgment to indicate the following: that restitution shall be paid to the state Victim Compensation and Government Claims Board, that defendants are jointly and severally liable for restitution, and that defendants were convicted on count 5 of violating Penal Code section 220, subdivision (a). The trial

4

court shall forward certified copies of the amended and corrected abstracts of judgment to the Department of Corrections and Rehabilitation.

This modification does not change the judgment.


FOR THE COURT:


       BLEASE       , Acting P. J.


       HULL       , J.


       MAURO       , J.

Filed 9/24/14 (unmodified version)

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

### IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

### THIRD APPELLATE DISTRICT

(San Joaquin)

----

| | |
|---|---|
| THE PEOPLE, | C069062 |
| Plaintiff and Respondent, | (Super. Ct. Nos. SF110015B & SF110015A) |
| v. | |
| GABRIEL ARMANDO LANGARICA et al., | |
| Defendants and Appellants. | |

A jury convicted codefendants and brothers Gabriel Langarica and Phillip Corral of kidnapping for ransom or extortion, rape by force or fear, forcible oral copulation, assault with intent to commit sex crimes during the commission of a burglary, robbery, burglary, and criminal threats. The trial court sentenced Langarica to 25 years to life on each count for rape and oral copulation; life with the possibility of parole on the count for kidnapping; and a determinate term of 12 years four months for the other counts. Due to

1

Corral's prior criminal record, the trial court sentenced him to 50 years to life on each count for rape and oral copulation; life with the possibility of parole on the count for kidnapping; and a determinate term of 31 years eight months. The trial court ordered both defendants to pay victim restitution.

On appeal, defendants contend (1) the trial court erred in declining to exclude evidence of the victim's identification of them; (2) there was insufficient evidence to support the sex crime convictions; (3) the trial court erred in instructing the jury on alternative theories of liability for the sex crimes; (4) the prosecutor committed misconduct during closing argument; (5) the trial court should have stayed certain sentences pursuant to Penal Code section 654; and (6) the abstract of judgment does not reflect the trial court's oral pronouncement of judgment. In addition, Corral contends (7) this court should strike one of Corral's prior prison term enhancements.

We conclude the trial court did not commit evidentiary or instructional errors, substantial evidence supports the sex crime convictions, and defendants forfeited their claim of prosecutorial misconduct. However, we will modify the judgment to stay a one-year enhancement of Corral's sentence based on a prior prison term, and we will direct the trial court to correct clerical errors in the abstract of judgment. We will affirm the judgment as modified.

BACKGROUND

Phillip Corral, then in his mid-twenties, recruited four younger men to accompany him in a stolen Chevrolet Suburban to collect a debt from a man he identified as Gustavo. The group included Corral's brother Gabriel Langarica, plus Robert Ortega, Francisco Barba, and a man they called "Smiley." Barba said he knew Langarica from school, but he had not previously met Corral. Barba remembered Corral as a light-skinned bald Mexican. Barba met Ortega on the day of the crime. Ortega had known Langarica for several months and had known Corral a shorter time.

Near midnight on the evening of October 13, 2006, Ortega stole an old Suburban and turned it over to Corral. Barba and Ortega testified that Corral was the leader and driver that night. Ortega testified that Corral promised to pay him to "rough up" Gustavo.

Gustavo later acknowledged a dispute with a man over a car and said the man had threatened to kill him. Gustavo said he had recently repossessed the car after the other man stopped making payments on it. He denied knowing the defendants. Gustavo worked at a restaurant where he normally finished work between midnight and 1:00 a.m.; that night, he did not leave work until about 1:00 a.m.

Just before 1:00 a.m., Corral drove the men in the Suburban to the parking lot of an apartment building; Corral said Gustavo lived there and would be getting home from work. The plan was to knock on the apartment door, and if there was no answer, to break in and "rough up" Gustavo, whom they expected would be hiding inside. Corral carried a cane and Ortega carried a bat.

After knocking on the apartment door, Corral kicked the door down. Gustavo's wife had been asleep in the apartment's only bedroom. The couple's two young children were asleep in the same room. The men began hitting the wife and shouting at her about her husband and "the money." She described the men as Hispanic. They first spoke English, but when she responded in Spanish, they switched to Spanish.[1] The wife said a Latino man with a light complexion beat her with a bat and threatened to kill her.

The wife said the same man grabbed her and dragged her to a sports utility vehicle, where he got into the driver's seat and threw her into the backseat with some of the other men, asking that she tell him how to find her husband's workplace so he could collect $3,000 from him. Barba and Ortega identified Corral as the man who repeatedly

---

[1] At all relevant times, the wife's testimony was translated from Spanish to English.

hit the wife, dragged her to the car and drove away to find her husband. Ortega testified that Langarica took the wife's purse from the apartment, and that Corral took some keys.

As the Suburban drove toward the restaurant where Gustavo worked, Corral laughingly told the men in the backseat to search the wife for weapons; one of the men removed her nightgown. The men beside her blindfolded her and began touching her breasts.

Gustavo left the restaurant before the group arrived there. Corral made a call on his cell phone to report that Gustavo was not there, and then drove toward a remote location, talking about killing or getting rid of the wife. Gustavo testified that when he arrived at his apartment, he found the door broken and his daughter running to tell him "mommy wasn't home." After calling 911, Gustavo repeatedly called his wife's cell phone and heard laughter.

As the group drove away from Gustavo's workplace, the wife said one of the men beside her forced her into the cargo area behind the seat and raped her. Then the man who had been sitting on the other side of her promptly replaced the first man and also raped her. Ortega said Langarica and Smiley sexually assaulted the wife, one after the other, while she cried and said no. Barba said Ortega forced the woman to give him oral sex.

The Suburban came to a stop on a dirt road beside a body of water. The driver got out and pushed the naked victim to her knees a few feet from the back bumper, then forced her to orally copulate him. After a car passed, he gave her his black T-shirt so other passing cars would not see she was naked. The wife escaped on foot. After the men drove away, she returned to the road to flag down a passing car and asked them to call police.

Police responded at 1:44 a.m. Before an ambulance transported the wife from the scene, police showed her a California Identification Card they found at the location where she said the Suburban had been parked. The card belonged to Robert Ortega. The wife

4

promptly identified him as the man who had been seated in the front passenger seat during her ordeal. Police also found grocery receipts that had been in the wife's purse.

Ortega was arrested that morning at his home. He had the wife's cell phone, along with a cane and bat. Police eventually learned that the other four men were Barba, Smiley and two brothers identified only as Phil and Gabriel. A police investigator showed the wife a photo array that included Barba's photograph; the wife positively identified him as one of the rapists.

At the preliminary hearing for Barba and Ortega, the wife identified them as the men who sat on either side of her in the Suburban and raped her. When trial commenced in this case, they were serving prison sentences for their participation in the crimes against the wife.

In mid-2008, after interviewing Barba and Ortega again, a police investigator included Corral's photograph in a "six pack" array shown to the wife; the wife pointed to his picture and, without hesitation, said "driver" in English. Later in 2008, the wife viewed other six-pack photo arrays but she did not identify Langarica from his photograph. Ortega, however, positively identified Langarica's photograph, saying Langarica sat behind the driver and beside the wife on the night of the crimes. At a 2009 preliminary hearing, the wife identified Langarica as the driver and Corral as the man who sat in the front passenger seat. An officer involved in the arrest of Corral in October 2008 said Corral looked different at his preliminary hearing in 2009: his hair was longer, he no longer had a goatee and he was wearing glasses. Ortega also testified that Corral's appearance had changed over time.

The jury convicted Langarica and Corral of kidnapping for ransom or extortion (Pen. Code, § 209, subd. (a) -- count 1);[2] rape by force or fear (§ 261, subd. (a)(2) --

_____

[2] Undesignated statutory references are to the Penal Code.

5

counts 2 and 3); forcible oral copulation (§ 288a, subd. (c)(2) -- count 4); assault with intent to commit a sex crime during the commission of a burglary (§ 220, subd. (b) -- count 5); first degree residential robbery (§ 211 -- count 6); first degree residential burglary (§ 459 -- count 7); and criminal threats (§ 422 -- count 8).  The trial court sentenced Langarica to 25 years to life on each count for rape and oral copulation; life with the possibility of parole on the count for kidnapping; and a determinate term of 12 years four months for the other counts.  The trial court sentenced Corral to 50 years to life on each count for rape and oral copulation; life with the possibility of parole on the count for kidnapping; and a determinate term of 31 years eight months.  The trial court ordered them jointly and severally liable for restitution to the wife and her family.

Additional facts are included in the discussion as they relate to specific issues on appeal.

DISCUSSION

I

Defendants contend the trial court erred in declining to exclude evidence of the wife's identification of them.

Prior to trial, Corral and Langarica filed motions to exclude evidence of the wife's identification of them during what they described as an "unduly suggestive" procedure at their preliminary hearing.  They claim the subsequent admission of identification evidence was so suggestive that their constitutional rights were violated.

Initially, the wife described the man who awakened her on the night of the crimes as fair-skinned and having a very short haircut.  She said that man was also the driver.  She estimated his age to be around 30.  At the preliminary hearing, she said the man at counsel table (Langarica) was the fair-skinned driver.  The prosecutor had not told her how many defendants were charged.  Although Corral was in the courtroom, the wife said she did not recognize anyone else after she identified Langarica.  The trial court observed that Corral was sitting some distance behind Langarica, had his head down and

6

was not directly facing the witness. The next day, the prosecutor asked the wife if she recognized Corral, pointing him out and identifying him for the record as Philip. The prosecutor offered to have Corral come closer. When they were separated by about 12 feet, the wife said she recognized Corral as the man who sat in the front passenger seat.

Langarica argues the wife identified him only because he sat at counsel table for the preliminary hearing "in the position traditionally allotted to the defendant." Corral contends she identified him because the prosecutor used his first name, which the wife possibly could have heard on the night of the crimes, and because the prosecutor directed the wife's attention to him, which Corral contends impermissibly implied he was involved and insinuated that her identification of Langarica the prior day was wrong and she should "keep trying."

Acknowledging the wife's "checkered history of identification," the trial court denied the motions to exclude victim identification, ruling that the circumstances asserted by defendants went to the weight and not the admissibility of the evidence. The trial court cited *People v. Contreras* (1993) 17 Cal.App.4th 813 (*Contreras*), expressing an intention to provide "a lot of latitude" during trial for questioning about possible misidentification.

In *Contreras*, a victim identified a defendant at a preliminary hearing after failing to recognize the defendant in photographs. (*Contreras*, *supra*, 17 Cal.App.4th at p. 822.) Although the trial court believed the witness lied about recognizing the defendant, it admitted the evidence and allowed the circumstances to be fully explored at trial. (*Id.* at pp. 823-824.) The Court of Appeal found no constitutional unfairness because the identification issue was "largely one of credibility" and therefore a "question for the jury at trial, not an issue to be resolved in pretrial motions." (*Ibid*.)

Here, the wife had not positively identified Langarica prior to the preliminary hearing. When she did identify him, she said he was the driver, even though she had

7

previously identified Corral as the driver.  But Barba and Ortega independently identified

Corral as the driver and Langarica as a participant.  At trial, the wife was questioned at

length about her identification of the perpetrators.  The defense offered an expert witness

on the fallibility of eyewitness testimony.  Defense counsel argued extensively about the

wife's identification errors in closing argument, at one point calling her "completely

unreliable."

Citing *United States v. Wade* (1967) 388 U.S. 218, 237-238 [18 L.Ed.2d 1149,

1162-1164], Langarica claims his federal constitutional rights were violated by the trial

court's failure to exclude any in-court identification as "impermissibly tainted" by

circumstances of the preliminary hearing identification.[3]  The United States Supreme

Court recently clarified the holding in *Wade* and other cases involving the suppression of

identification evidence, saying its intent was to prevent unfair police practices, not to

eliminate suggestive identifications.  (*Perry v. New Hampshire* (2012) 565 U.S. ___, ___

[181 L.Ed.2d 694, 709-710] (*Perry*).)  Screening for reliability before trial is required

only when it is necessary "to deter police from rigging identification procedures."  (*Id.* at

p. ___ [181 L.Ed.2d. at p. 703].)

The *Perry* majority emphasized its recognition that "the jury, not the judge,

traditionally determines the reliability of evidence" and numerous other safeguards of the

adversary system protect against "dubious identification evidence."  (*Perry, supra*,

565 U.S. at p. ___ [181 L.Ed.2d at pp. 710-712] [mentioning vigorous cross-examination,

opening and closing arguments, jury instructions and protective rules of evidence,

including the admissibility of expert testimony about the hazards of eyewitness

identification].)  The California Supreme Court acknowledged *Perry*'s holding in stating

---

[3]  Corral cites *People v. Craig* (1978) 86 Cal.App.3d 905, for the same proposition.  In that case, the court held that a " 'single person showup' " was impermissibly suggestive if it was not justified by the circumstances of the case.  (*Id.* at 914.)

8

that the "federal Constitution's due process clause is not implicated" when suggestive identification procedures are "not arranged by law enforcement officers." (*People v. Thomas* (2012) 54 Cal.4th 908, 931.)

In this case, by the time of the preliminary hearing, two accomplices already identified the defendants. The wife corroborated the identification by pointing to Corral in an unchallenged photo array procedure. The trial court allowed both defendants to wear civilian clothing and Corral to wear glasses; it allowed both to choose their seats in the courtroom and also to question the wife before any identification.

Even if the procedures had been unduly suggestive, they did not implicate due process because they were not arranged by law enforcement officers. (*People v. Thomas, supra,* 54 Cal.4th at p. 931.) Moreover, the California Supreme Court has "never extended the rules regarding extrajudicial identifications to subsequent identifications in court." (*People v. Carpenter* (1997) 15 Cal.4th 312, 368.)

The trial court did not err when it concluded that determining the reliability of the wife's testimony was within the province of the jury. The trial court was not required to weigh the evidence for reliability before trial, and it was not required to exclude it. Even when reliability is reviewed before trial, witness identification is inadmissible only when there is a " ' "very substantial likelihood of irreparable misidentification." ' " (*People v. Arias* (1996) 13 Cal.4th 92, 168, quoting *Manson v. Brathwaite* (1977) 432 U.S. 98, 116 [53 L.Ed.2d 140, 155] and *Simmons v. United States* (1968) 390 U.S. 377, 384 [19 L.Ed.2d 1247, 1253].) Defendants have not established a substantial probability that they were misidentified or a violation of due process.

II

Defendants next contend there was insufficient evidence to support the sex crime convictions.

Langarica claims the only evidence at trial of his participation in the sex crimes was testimony by Ortega that Langarica demanded and received oral sex from the wife;

9

he argues that statement is untrustworthy because Ortega was an accomplice. Langarica asserts there was insufficient evidence to support his convictions for rape, oral copulation and assault with intent to commit sex crimes during the commission of a burglary.

Corral claims his rape convictions should be reversed because although he directed the other men to search the wife for weapons prior to the rapes, that was not a direction to rape her.

We review a challenge to the sufficiency of evidence by determining from the entire record whether a reasonable jury could have found that the prosecution sustained its burden of proof. (*People v. Mincey* (1992) 2 Cal.4th 408, 432.) In doing so, we consider the evidence in a light favorable to the judgment and we "presume the existence of every fact the trier could reasonably deduce from the evidence in support of the judgment." (*Ibid*.) "The test is whether substantial evidence supports the decision, not whether the evidence proves guilt beyond a reasonable doubt." (*Ibid*.) As to witness credibility, we must defer to the trier of fact. (*People v. Barnes* (1986) 42 Cal.3d 284, 303-304.) If the findings are reasonably justified by substantial evidence, "reversal is not warranted merely because the circumstances might also be reasonably reconciled with a contrary finding." (*People v. Redmond* (1969) 71 Cal.2d 745, 755.) In fact, to set aside a jury verdict, "it must clearly appear that upon no hypothesis whatever is there sufficient substantial evidence to support it." (*Ibid*.)

Liability for a crime falls on those who directly commit the act constituting the offense as well as on those who aid or abet in its commission; all are liable under the law as principals. (§ 31.) One who aids or abets a crime is not only guilty of the crime he knew his confederates contemplated but also of any other reasonably foreseeable offenses they commit. (*People v. Croy* (1985) 41 Cal.3d 1, 12, fn. 5.) In other words, a defendant is liable for all the natural and reasonable consequences of acts he knowingly aids or encourages. (*Ibid*.)

10

When the group of men broke into the wife's apartment, she was asleep in her bed wearing a nightgown. The driver, identified at trial as Corral, grabbed the wife by the hair or by her arm and forced her into the Suburban. When they failed to find her husband and began driving toward the levee, Corral told the others he intended to "get rid of her."

It was in the context of getting money from her husband that Corral ordered the wife "searched" and in the context of going to a place to "get rid of" the wife that the rapes and forced oral copulation occurred. The men in the backseat beat her, called her names and threatened her with death while the sex demands escalated. Defendant Langarica pushed her over the seat into the cargo area. Ortega remembered hearing Langarica say "suck it" while the wife cried; Ortega also heard her saying no and crying while another man pinned her on her back, raping her. The wife said two men successively penetrated her vagina with their penises while she was in the cargo area of the vehicle. One of them also penetrated her anus. The sexual assault continued until the vehicle came to a stop. After the stop on a dark road, Corral got out and ordered the naked victim to give him oral sex. When interviewed by police immediately after the crimes, the wife had muddy feet, a swollen arm and many scratches and marks on her body.

All of the witnesses agreed that the driver (Corral) forced the wife to orally copulate him at the levee. They did not agree on which of the other men sexually assaulted her as they drove there. However, viewing the evidence in the light most favorable to the verdict, a reasonable fact finder could conclude from the evidence that although only Corral and two other men personally sexually assaulted the wife, all five either actively participated in the sexual assaults or were " 'concerned' " with their commission. (See *People v. Nguyen* (1993) 21 Cal.App.4th 518, 529 [however slight the " 'concern' " may have been, liability attaches if a defendant with the requisite state of mind directly or indirectly aids the actual perpetrator of a sex crime].)

11

Whether sex crimes were the natural and probable consequence of the other charged crimes is a question of fact for the jury. (*People v. Nguyen, supra*, 21 Cal.App.4th at p. 531.) Even when sex crimes are committed " 'on the spur of the moment,' " as defendants argue happened here, aider and abettor liability can attach instantaneously, and rape is not uncommon in home invasion robberies, particularly where the intruders bring sufficient numbers to overcome any potential resistance. (*Id*. at pp. 532-533.) The test for liability is "whether a reasonable person in the defendant's position would have or should have known that the charged offense was a reasonably foreseeable consequence of the act aided and abetted." (*Id*. at p. 535.) A reasonable person would expect that five men forcing their way into an apartment at 1:00 a.m. wielding bats and canes might encounter a woman who could be forced to submit to whatever demands they might make of her, including sexual violence.

If it was not obvious when the five men broke down the door of the wife's apartment that sex crimes were foreseeable, it certainly became foreseeable as they dragged her out of her bed in her nightgown and as they later drove her to a remote location. As the likelihood of sexual assault escalates from possible or likely to certain, and as a group of assailants continues to aid and assist the endeavor, "it will not do" for them to later assert "they were concerned only with robbery and bear no responsibility for the sexual assault." (*People v. Nguyen, supra*, 21 Cal.App.4th at p. 534.)

Aider and abettor liability attaches where (1) the aider and abettor knows the unlawful purpose of the direct perpetrator, (2) the aider and abettor intends to commit, encourage or facilitate the commission of the offense, and (3) the aider and abettor's acts or advice aids, promotes, encourages or instigates the commission of the offense. (*People v. Beeman* (1984) 35 Cal.3d 547, 561.) An aider and abettor's guilt is based on a combination of the direct perpetrator's acts and the aider and abettor's own acts and mental state. (*People v. McCoy* (2001) 25 Cal.4th 1111, 1117.)

Because an aider and abettor's culpability depends on his own mental state, in some circumstances, he may be guilty of a greater or lesser crime than the direct perpetrator. (*People v. McCoy, supra*, 25 Cal.4th at p. 1120; *People v. Lopez* (2011) 198 Cal.App.4th 1106, 1118.) There was no evidence here, however, of any distinction among the five assailants. Although the language " 'equally guilty' " is no longer in pattern jury instructions, the concept remains a generally correct statement of law. (*People v. Lopez, supra,* 198 Cal.App.4th at p. 1119; *People v. Samaniego* (2009) 172 Cal.App.4th 1148, 1165.) Even if Corral's order to search the wife was not a direct order to rape her, it is reasonably foreseeable that a group of young men forcibly "patting down" the body of a frightened woman in a nightgown would proceed to disrobe and sexually violate her. It is also reasonably foreseeable that a group of five men who collectively kidnap a woman from her bed might soon use the same intimidating force to sexually assault her.

The law did not require the jury to conclude that the defendants individually, intentionally and directly participated in each of the sex crimes for which they were charged and convicted. There was substantial evidence that both were willing participants in an escalating criminal episode in which the wife was sexually assaulted by three of the five assailants, and that all five actively participated in the intimidation that facilitated the robbery, kidnapping and sexual assaults. The evidence was sufficient to support the verdicts because sexual assault was a natural and probable consequence of the kidnapping, which was a natural and probable consequence of the late-night home invasion and robbery.

### III

Defendants further contend the trial court erred in instructing the jury on alternative theories of liability for the sex crimes. They claim there was insufficient evidence to support instructing with CALCRIM Nos. 417 and 402, and they seek a new trial on the sex crimes.

13

The trial court instructed the jury with CALCRIM No. 417 [liability for coconspirators' acts].  "Under California law, a person who aids and abets the commission of a crime is a 'principal' in the crime, and thus shares the guilt of the actual perpetrator."  (*People v. Prettyman* (1996) 14 Cal.4th 248, 259.)  Liability is based on an act by the perpetrator to which the accomplice contributed.  (*Ibid.*)  Defendants claim an uncharged conspiracy cannot be the basis for aider and abettor liability because the theory is not consistent with definitions of "principal" in Penal Code section 31.  The California Supreme Court rejected this argument, however, holding that conspirators are included in the definition of principal.  (*People v. Mohamed* (2011) 201 Cal.App.4th 515, 523 [citing *In re Hardy* (2007) 41 Cal.4th 977, 1025].)  Accordingly, the trial court did not err in giving CALCRIM No. 417.

The trial court also instructed the jury with CALCRIM No. 402 [natural and probable consequences doctrine].  The trial court provided the following instruction:

"Under the natural and probable consequences doctrine, a person who is guilty of one crime may also be guilty of other crimes that were committed at the same time.

"The defendant is charged with Counts 1 through 8 on the List of Counts provided to you with your jury instruction packet.

"Under the natural and probable consequences doctrine, you must first decide whether the defendant is guilty of Count 1, Kidnapping for Ransom/Extortion.  If you find the defendant guilty of this crime, you must then determine whether he is guilty of Counts 2 through 6, and 8, or any lesser crime thereto.

"To prove that the defendant is guilty of any of the crimes charged in Counts 2 through 6 and 8, or any lesser crime thereto, under this doctrine, the People must prove that:

14

"1.  The defendant is guilty of Count 1, Kidnapping for Ransom/Extortion;

"2.  During the commission of Count 1, a coparticipant in Count 1 committed one or more of the crimes charged in Counts 2 through 6 and 8, or any lesser crime thereto; and

"3.  Under all of the circumstances, a reasonable person in the defendant's position would have known that the commission of one or more of the crimes in Counts 2 through 6 and 8, or any lesser crime thereto, was a natural and probable consequence of the commission of Count 1.

"A coparticipant in a crime is the perpetrator or anyone who aided and abetted the perpetrator.  It does not include the victim or innocent bystander.

"A natural and probable consequence is one that a reasonable person would know is likely to happen if nothing unusual intervenes.  In deciding whether a consequence is natural and probable, consider all of the circumstances established by the evidence.  If the crimes charged in Counts 2 through 6 and 8, or any lesser crime thereto, were committed for a reason independent of the common plan to commit Count 1, then the commission of Counts 2 through 6 and 8, and any lesser crime thereto, was not a natural and probable consequence of Count 1.

"To decide whether the crimes charged in Counts 1 through 8, or any lesser crime thereto, were committed, please refer to the separate instructions for these crimes in your jury instruction packet."

Defendant Langarica contends that the instruction incorrectly told the jury the target offense was kidnap for ransom, whereas Barba and Ortega testified that the group had agreed at the outset only to commit robbery and burglary.  As further evidence that the group agreed only to robbery, Langarica points to Barba's police testimony that, when Corral started hitting the wife, Langarica asked Corral, "What the heck are you doing?"

Although we do not discredit the evidence that the group initially intended to rob and "rough up" Gustavo, that plan was foiled when the group discovered Gustavo was not at home and his wife did not hand over the money Corral said he expected to collect. When Corral dragged Gustavo's wife out of her apartment in a nightgown demanding that she lead him to her husband, a new plan emerged. Even if Langarica wondered aloud why his brother was hitting the wife, as Barba testified, there was no evidence of any objection to forcing her from her bed, throwing her into the vehicle and driving to where they expected to find her husband. The unmistakable objective at that point was kidnapping for ransom. As we have explained, it is not unusual for a new criminal objective (and related aider and abettor liability) to occur spontaneously. (*People v. Nguyen, supra*, 21 Cal.App.4th at p. 532.) Moreover, culpability is imposed on aiders and abettors "simply because a reasonable person could have foreseen the commission of the nontarget crime." (*People v. Canizalez* (2011) 197 Cal.App.4th 832, 852.) There was substantial evidence to support instructing the jury that kidnapping for ransom was the target crime by the time the wife was seated in the backseat of the Suburban.

IV

In addition, defendants contend the prosecutor committed misconduct during closing argument. They argue the prosecutor committed misconduct when she suggested in closing that a guilty verdict could be based on what defendants call "group guilt." Defendants assert that only three men sexually assaulted the wife and none of them can be liable for the crimes of the others.

As we have explained, defendants' argument is contrary to the law of aider and abettor liability. Moreover, defendants forfeited any claim of prosecutorial misconduct by failing to object at trial and failing to request a jury admonition. (*People v. Samayoa* (1997) 15 Cal.4th 795, 841; *People v. Kipp* (2001) 26 Cal.4th 1100, 1130 [failure to object on constitutional grounds at trial forfeits appellate contention that prosecutorial misconduct violated constitutional protections].) Defendants acknowledge the lack of

16

objection but claim the prosecutor's arguments were so pervasive, "defense counsel may have felt objection would be futile." They further suggest the arguments were so egregious that admonishment would not have cured the harm under the authority of *People v. Dykes* (2009) 46 Cal.4th 731 (*Dykes*).

*Dykes* held that a closing argument reaches the incurable level only when a prosecutor uses " ' "deceptive or reprehensible methods" ' " and " 'it is reasonably probable that without such misconduct, an outcome more favorable to the defendant would have resulted.' " (*Dykes, supra*, 46 Cal.4th at p. 760, quoting *People v. Riggs* (2008) 44 Cal.4th 248, 298.) In this case, the prosecutor described the jury instructions on aider and abettor liability and the evidence supporting each alternative theory. Defendants point to nothing inherently deceptive or reprehensible in the argument; they simply disagree with the prosecutor's interpretation of the law. Defendants claim prejudice in "incorrect statements of the law," but even if the prosecutor's characterization of legal standards was wrong, proper instructions render such errors harmless. (*People v. Montiel* (1993) 5 Cal.4th 877, 937 (*Montiel*).) The jury was instructed that statements of counsel were not evidence and that the jury was to follow the court's instructions if attorney comments conflicted with the instructions. We presume that the jurors understood and followed the instructions. (*People v. Hinton* (2006) 37 Cal.4th 839, 871.)

The claim of prosecutor misconduct was forfeited, but even if it had been timely raised, allegedly erroneous descriptions of law would have been rendered harmless under *Montiel, supra,* 5 Cal.4th at page 937. Accordingly, the failure of defense counsel to object to the prosecutor's closing argument did not deprive defendants of the effective assistance of counsel.

V

Defendants also claim the trial court should have stayed certain sentences pursuant to section 654. They argue the sentence for burglary should be stayed in light of the

17

sentence for robbery, the sentence for criminal threats should be stayed as incident to the robbery and kidnapping, and the sentence for assault with intent to commit sex crimes should be stayed in light of the sentences for rape and forcible oral copulation.

"An act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision.  An acquittal or conviction and sentence under any one bars a prosecution for the same act or omission under any other."  (§ 654, subd. (a).)

Whether a sentence should be stayed under section 654 is a question of fact for the trial court, which is vested with broad discretion, so we must affirm if there is substantial evidence to support the trial court's order.  (*People v. Jones* (2002) 103 Cal.App.4th 1139, 1143.)  On appeal, we review the record in the light most favorable to the respondent, presuming the existence of every fact the trial court could reasonably deduce from the evidence.  (*Ibid*.)  When a trial court sentences a defendant to separate terms without expressly finding separate objectives, the factual finding of separateness is implied.  (*People v. Islas* (2012) 210 Cal.App.4th 116, 129.)

Ordinarily, a defendant who commits burglary as an incident and means of perpetrating another felony may not be punished separately for the burglary.  (*People v. Centers* (1999) 73 Cal.App.4th 84, 98 [citing cases].)  There are exceptions, however.  For example, violent crimes with multiple victims can be separately punished because when a crime of violence is committed with the intent to harm more than one person or in a way likely to harm several persons, greater culpability precludes application of section 654.  (*Id*. at p. 99 [upholding sentences for both burglary and kidnapping when second occupant of dwelling was traumatized but not kidnapped].)  Multiple punishments are also upheld when a defendant has multiple objectives, such as to steal and to inflict physical harm.  (*People v. Nelson* (1989) 211 Cal.App.3d 634, 638-339 [affirming separate punishment for burglary and assaults].)

Defendants claim the burglary sentences of one year four months for Langarica and two years eight months for Corral should have been stayed because the burglary (breaking and entering the wife's apartment) was incidental to the planned robbery of Gustavo. The testimony at trial suggested that Corral's initial plan was to confront Gustavo about money at his door, then "rough [him] up." But the breaking and entering was anticipated if there was no response to knocking.

It was apparent soon after the group entered the apartment that Gustavo was not at home, and that the group was not confronting a man recently returned from work, as anticipated, but two young children and a woman, who had been asleep in their beds. The group could have walked out of the apartment. Instead, they developed new criminal objectives. When an alternate objective is developed unexpectedly in the middle of a planned crime, section 654 does not preclude multiple punishments. (*People v. Trotter* (1992) 7 Cal.App.4th 363, 368; *People v. Vidaurri* (1980) 103 Cal.App.3d 450, 465-466.)

The group did not forcibly rob Gustavo of $3,000; they beat his wife with a bat in the presence of her children, took her personal property and dragged her out into the night. On these facts, the trial court did not err in finding that the defendants' initial objective for the burglary and "rough[ing] up" of Gustavo was distinct from the later objective for taking the wife's purse, phone and keys by force and fear.

Defendants also contend the criminal threats they made to the wife (repeatedly telling her they would kill her) were part of the robbery and kidnapping crimes and should not have been separately punished. The early threats do appear to have been made to keep the wife compliant so they could rob and kidnap her, but during the subsequent drive to the levee, the threats were renewed in the context of sexually assaulting and "get[ting] rid" of her. The trial court found that the criminal threats made during the drive to the levee were separate from the other criminal acts. Based on that factual finding, which is supported by the cited evidence, separate sentences were warranted. (See *People v. Nubla* (1999) 74 Cal.App.4th 719, 730-731 [approving separate

19

punishment for placing a gun against victim's head and putting the gun in her mouth although the acts occurred in rapid succession, because neither facilitated nor was incidental to the other]; *People v. Vidaurri, supra,* 103 Cal.App.3d at p. 466 [separate punishment for burglary and assault because assaults were committed later in response to unforeseen circumstances]; *People v. Jackson* (1967) 255 Cal.App.2d 584, 587-588 [separate punishment for series of three crimes where new criminal intents were formed as events unfolded].)

Defendants next contend the assault with intent to commit sex crimes may not be separately punished from the sex crimes that followed. The trial court addressed indeterminate sentences for kidnapping, rape and forcible oral copulation before imposing determinate sentences for the other crimes, identifying robbery as the primary count for determinate sentencing. The trial court distinguished the assault from the robbery when imposing consecutive determinate sentences, noting that the crimes were separated by time and distance. The trial court did not mention the rape and forcible oral copulation sentences when imposing the sentence for the assault with intent to commit sex crimes. Again, however, the finding of separate objectives is implied and will be upheld if supported by substantial evidence. (*People v. Islas, supra*, 210 Cal.App.4th at p. 129.)

Langarica was sentenced to 25 years to life on each count for rape and forced oral copulation; Corral was sentenced to 50 years to life for each of those crimes. Langarica's sentence for assault with intent to commit sex crimes was one year four months, one-third the four-year midterm; Corral's sentence for assault with intent to commit sex crimes was twice that length of time due to his prior offenses.

Multiple sex crimes, even identical ones, can be separately punished where a defendant renews assaultive behavior after even a brief interruption. (*People v. Harrison* (1989) 48 Cal.3d 321, 337-338.) In this case, the wife testified that the men removed her nightgown and repeatedly touched her breasts before they arrived at her husband's

20

workplace. While they were in the parking lot in front of the workplace, they removed a T-shirt they had placed over her head and talked about what to do next. She heard the driver say they could not go back to the apartment because the door was broken. The rapes occurred after they left the parking lot.

Corral contends that removing the wife's nightgown was merely incidental to rape and therefore did not warrant separate punishment, citing *People v. Greer* (1947) 30 Cal.2d 589, 604 [removal of underclothing incidental to rape]. But the *Greer* approach of assuming that fondling is incidental to other sex crimes has been abandoned. (*People v. Scott* (1994) 9 Cal.4th 331, 347, fn. 9.) Moreover, pulling the wife out of her bed, removing her nightgown, putting a T-shirt over her head and fondling her breasts were all assaultive acts and all occurred before the break in the parking lot to formulate a new plan. None of the acts directly facilitated the subsequent rapes and none was incidental to rape or oral copulation. Section 654 is intended to ensure that a defendant is punished commensurate with his culpability, so it does not preclude punishment for distinct and separate sex acts during the same criminal venture. (*People v. Perez* (1979) 23 Cal.3d 545, 553.) Accordingly, separate sentencing was supported by substantial evidence and did not violate section 654. (See *ibid.*)

VI

Defendants contend the abstract of judgment does not track the trial court's oral pronouncement of sentence. The Attorney General agrees, and so do we.

Judgment in a criminal case is defined by the oral pronouncement of sentence and new terms cannot be added later to modify it. (*People v. Mesa* (1975) 14 Cal.3d 466, 471, superseded on other grounds as stated in *People v. Turner* (1998) 67 Cal.App.4th 1258, 1267-1268.) An appellate court, however, may correct clerical errors in the judgment. (*People v. Mitchell* (2001) 26 Cal.4th 181, 185.)

The trial court ordered a $10,000 fine pursuant to section 1202.4 and victim restitution of $5,893.10 pursuant to section 1202.4, subdivision (f). The prosecutor

21

supplied the restitution amount and identified it as having been paid to the wife and her family by the Victim Compensation and Government Claims Board. Pronouncing sentence, the trial court stated that the defendants were to be jointly and severally liable for the restitution. The abstract of judgment, however, erroneously directed the restitution to be paid directly to the victims and did not mention the joint and several nature of the obligation. The Attorney General agrees that the trial court ordered restitution paid to the victim restitution fund, not directly to the wife and her family, and that the order of restitution was joint and several as to both defendants. We agree that the abstract must be corrected in this regard.

Defendants further contend an order for a $1,000 mandatory fee to San Joaquin County must be stricken from the abstract because it was not included in the oral pronouncement of sentence. Although the oral pronouncement did not include the fee, the Attorney General asserts that the administrative fee was mandated under sections 1202.4, subdivision (c) and 2085.5, subdivision (c), along with California Code of Regulations, title 15, section 3097, subdivision (c). Thus, the trial court's failure to impose it resulted in an unauthorized sentence that may be corrected on appeal. We agree with the Attorney General.

"Effective January 1, 2007 and thereafter, when an inmate owes any obligation pursuant to a direct order of restitution imposed by a court, the department [of Corrections and Rehabilitation] shall deduct 50 percent or the balance owing, . . . from the inmate's wages and trust account deposits . . . . In addition, an administrative fee of 10 percent of the deduction shall be deducted to reimburse the department for its administrative costs, for a maximum deduction of 55 percent." (Cal. Code Regs., tit. 15, § 3097, subd. (c).)

The trial court apparently realized its error in omitting the mandatory fee and corrected it in the abstract of judgment. If the trial court had not made the correction, we would have ordered it. (See *People v. Smith* (2001) 24 Cal.4th 849, 852-853 [appellate

22

courts may correct sentence to add an omitted but mandatory element].)  No correction is necessary regarding the mandatory fee.

Defendants contend for the first time in Corral's reply brief that although the fee is mandatory, it will be levied by the Department of Corrections and Rehabilitation without reference to the abstract of judgment, so there is a risk of a surcharge on the surcharge.  The point is forfeited because it was raised without providing the Attorney General an opportunity to respond.  (See *People v. Baniqued* (2000) 85 Cal.App.4th 13, 29.)

VII

Corral contends this court should strike one of his prior prison term enhancements.

The trial court imposed a five-year sentence enhancement on Corral for his prior robbery conviction and 2 one-year sentence enhancements for his prior prison terms.  He contends that one of the prison terms was for the robbery conviction that supported the five-year enhancement, so the trial court should not have imposed the second one-year enhancement.  The Attorney General agrees, and we do too.

Enhancements under sections 667 and 667.5 are intended to punish recidivism, but they may not be applied together for the same offense.  (*People v. Jones* (1993) 5 Cal.4th 1142, 1152-1153.)  We will modify the judgment to stay the one-year robbery-related prison term enhancement pursuant to section 667.5, subdivision (b).

DISPOSITION

The judgment is modified to stay the one-year robbery-related prison term enhancement pursuant to section 667.5, subdivision (b).  The judgment is affirmed as modified.  The trial court is directed to amend the abstract of judgment to reflect the judgment as modified, and to correct the abstract of judgment to indicate the following: that restitution shall be paid to the state Victim Compensation and Government Claims Board, and that defendants are jointly and severally liable for restitution.  The trial court

23

shall forward a certified copy of the amended and corrected abstract of judgment to the Department of Corrections and Rehabilitation.

                                                                       _____MAURO_____, J.

We concur:

_____BLEASE_____, Acting P. J.

_____HULL_____, J.

24